UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Richard Kallman as Co-Trustee of the Kallman     :     Case No. 1:24-cv-08291-AT
Family Irrevocable Trust and Richard Kallman     :
Individually,                                    :
                                                 :
                              Plaintiffs,        :
                                                 :     **FIRST AMENDED**
              -against-                           :     **VERIFIED COMPLAINT**
                                                 :
Kineret Kallman as Co-Trustee of the             :
Kallman Family Irrevocable Trust, Kineret        :     **JURY TRIAL DEMANDED**
Kallman Individually, Ira Allen Walker, UBS      :
Financial Services, Inc., and Unknown UBS        :
Employees 1-10,                                  :
                                                 :
                              Defendants.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiffs Richard Kallman as Co-Trustee of The Kallman Family Irrevocable Trust and

Richard Kallman Individually ("Mr. Kallman"), as and for his Verified Complaint against Kineret

Kallman as Co-Trustee of The Kallman Family Irrevocable Trust and Kineret Kallman

Individually ("Mrs. Kallman"), and against Ira Allen Walker ("Mr. Walker"), UBS Financial

Services, Inc. ("UBS"), and Unknown UBS Employees 1-10 (the "UBS Employees," and with

Mrs. Kallman, Mr. Walker and UBS, collectively, the "Defendants"), by and through Mr.

Kallman's undersigned attorneys, alleges as follows:

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................. 5

THE PARTIES.................................................................................................... 8

JURISDICTION AND VENUE ........................................................................... 10

STATEMENT OF FACTS .................................................................................. 11

    A.  Mr. and Mrs. Kallman Establish A Trust Funded By Mr. Kallman's Parents
        That Requires Joint Authorization For Any Distributions................................. 11

       i.  The Trust Requires Mr. Kallman's "Consent In Writing" To Make A Distribution.... 11

      ii. The Prior Financial Advisor At JP Morgan Required All Distributions
          To Be Jointly Authorized By Mr. And Mrs. Kallman As Required By The Trust ...... 12

    B.  Mrs. Kallman And Mr. Walker Conceal Their Extra-Marital Affair And
        Desire To Fully Control The Trust In Derogation Of The Trust's Explicit Terms .......... 12

       i.  Mrs. Kallman And Mr. Walker Conspire To Move The Trust To UBS...................... 12

      ii. Mrs. Kallman And Mr. Walker Dupe Mr. Kallman
         To Transfer The Trust's Assets To UBS............................................................. 14

      iii.The Defendants Owe A Fiduciary Duty To The Trust And Mr. Kallman ................. 15

    C.  Mrs. Kallman's And Mr. Walker's Relationship................................................ 17

       i.  Mr. Walker Uses Private Jets, Luxury Vacations And Lavish Gifts To
         Continue His Sexual Relationship With His Client Mrs. Kallman And
         Maintain Control Of Her Accounts And The Trust Account ...................................... 17

      ii. Mrs. Kallman Files For Divorce And
         Continues Her Relationship With Mr. Walker ............................................... 18

    D.  Mrs. Kallman And Mr. Walker Inflict Emotional Distress On Mr. Kallman
        To Pressure Him To Pay $9 Million And Fund An Extravagant Lifestyle ..................... 20

       i.  Mr. Walker Attends The First Mediation Session,
         Offers To Downgrade A TRO For $250,000 And The Marital Residence,
         And Pressures Mr. Kallman's Brother (And Employer)............................................ 20

      ii. Mr. Walker Threatens To "Beat" And Seriously Injure, If Not Murder,
         Mr. Kallman's Attorney, To Inflict Emotional Distress
         On Mr. Kallman And Extort $9 Million........................................................ 22

      iii.The Defendants Knowingly Facilitate An Unauthorized Distribution

Of The Trust's Funds And Mrs. Kallman Conceals Information About The Trust,
Inflicting Emotional Distress On Mr. Kallman ................................................................ 25

E.  UBS Failed To Properly Supervise Mr. Walker And The UBS Employees .................... 28

    i.  The SEC Requires UBS To Maintain Records Which Should Have Alerted UBS
        To The Conduct Described In This Complaint ............................................................ 28

    ii. UBS Has Been Previously Investigated For Failing To Maintain Records
        That Would Allow It To Properly Supervise The Conduct Of Its Employees............. 29

    iii.Despite The Consent Order, UBS Ignored Mr. Walker's Conduct
        Or Failed To Properly Monitor Or Detect His Conduct Or
        The Conduct Of The UBS Employees ......................................................................... 32

F.  Mr. Kallman Has Suffered Severe Psychological Trauma
    Due To Mrs. Kallman's And Mr. Walker's Outrageous Conduct And
    Was Terminated From His Position At His Family Business .......................................... 33

FIRST CAUSE OF ACTION
(Declaratory Judgment Against Mrs. Kallman)............................................................... 34

SECOND CAUSE OF ACTION
(Removal of Mrs. Kallman as Co-Trustee of the Trust).................................................. 34

THIRD CAUSE OF ACTION
(Breach of Fiduciary Duty against all Defendants) ........................................................ 35

FOURTH CAUSE OF ACTION
(Aiding and Abetting Breach of Fiduciary Duty against
Mr. Walker, UBS and the UBS Employees).................................................................... 36

FIFTH CAUSE OF ACTION
(Willful Misconduct against all Defendants) .................................................................. 37

SIXTH CAUSE OF ACTION
(Void Unauthorized Distributions against all Defendants)............................................. 37

SEVENTH CAUSE OF ACTION
(Accounting) ................................................................................................................... 37

EIGHTH CAUSE OF ACTION
(Breach of Contract against all Defendants)................................................................... 38

NINTH CAUSE OF ACTION
(Malicious Interference with Contract Rights against
Mr. Walker, UBS and the UBS Employees).................................................................... 38

TENTH CAUSE OF ACTION
(Intentional Infliction of Emotional Distress against Mrs. Kallman and Mr. Walker)................ 39

ELEVENTH CAUSE OF ACTION
(Respondeat Superior against UBS) ........................................................................................... 40

TWELFTH CAUSE OF ACTION
(Negligent Retention against UBS) ............................................................................................. 40

THIRTEENTH CAUSE OF ACTION
(Negligent Supervision against UBS)........................................................................................... 41

PRAYER FOR RELIEF ................................................................................................................ 42

## PRELIMINARY STATEMENT

1.      Illicit sex with a client. Unauthorized distributions from a UBS Trust account. Private jet travel. Threats to "beat" and seriously injure, if not murder, an attorney. All are elements of this outrageous case where Mr. Walker abused his position as a wealth manager at UBS, and was assisted by other unknown UBS Employees, to (a) further an inappropriate sexual relationship with his client's wife (i.e., Mrs. Kallman, who is also a UBS client), (b) facilitate Mrs. Kallman's breach of fiduciary duties and willful misconduct to The Kallman Family Irrevocable Trust (the "Trust") by helping her make unauthorized distributions from the Trust's UBS account, (c) use Mr. Kallman's money to fund an extravagant lifestyle of private jet travel, luxury vacations, lavish gifts, expensive jewelry, and high-priced real estate, and (d) enrich UBS and the UBS Employees who conspired with him.

2.      In particular, Mrs. Kallman and Mr. Walker spearheaded a wide-ranging effort to pressure Mr. Kallman to pay Mrs. Kallman $9 million to settle their divorce. Mr. Walker inserted himself in the divorce proceedings (until the divorce court ordered him to stop), made threats to "beat" and seriously injure, if not murder, Mr. Kallman's divorce attorney (which ultimately led Mrs. Kallman's divorce attorney to resign and report Mr. Walker to the police), demanded payment from Mr. Kallman's brother (who is also his employer), and, on information and belief, filed a false police report to have Mr. Kallman arrested, a plan that failed. Mr. Walker also made improper distributions from the Trust's UBS account and was, on information and belief, assisted by UBS and the other UBS Employees.

3.      In early August 2024, Mr. Kallman learned that Mrs. Kallman, with the assistance of Mr. Walker and the UBS Employees, abused her position as Co-Trustee of the Trust by making one or more unauthorized distributions of net income and principal from the Trust where (a)

Defendants knew Mr. Kallman's written consent was required to make any distributions from the Trust and (b) Mrs. Kallman, and potentially the other Defendants, knew Mr. Kallman refused to provide the required consent, and all Defendants certainly knew Mr. Kallman had not provided written consent.

4.    In addition to facilitating one or more unauthorized distributions from the Trust's UBS account, Mr. Walker attended every mediation session between Mr. and Mrs. Kallman in their divorce proceedings until the divorce court ordered him to stop. And Mr. Walker demanded that Mr. Kallman pay Mrs. Kallman $9 million—money that Mr. Walker knew he would manage at UBS, enriching him, UBS and the UBS Employees, and furthering his sexual relationship with Mrs. Kallman and funding his extravagant lifestyle.

5.    Mr. Kallman refused to make this $9 million payment, enraging Mr. Walker. In February 2024, Mr. Walker threatened Mr. Kallman's divorce attorney Frank J. LaRocca ("Mr. LaRocca") at a mediation session, screaming that he will "take that ginny outside and beat his ass!" Mr. LaRocca is of Italian descent.

6.    In May 2024, Mr. Walker called Mrs. Kallman's divorce attorney and coldly threatened to commit a violent act or worse on Mr. LaRocca: "it could be dangerous to his health while he is walking from his office to his car."

7.    Due to Mr. Walker's involvement and conduct in the divorce proceedings, including his outrageous threats of violence, if not death, Mrs. Kallman's divorce attorney resigned from representing Mrs. Kallman and reported Mr. Walker's threats to the police. A copy of the police report filed by Mrs. Kallman's divorce attorney is annexed hereto as Exhibit 1.

8.    Mr. Walker also contacted Mr. Kallman's brother, Robert Kallman, who is also his employer, to demand payment to settle the divorce action between Mr. and Mrs. Kallman.

9.      In June 2024, and on information and belief, either Mr. Walker or Mrs. Kallman filed a false police report against Mr. Kallman in an effort to get him arrested and, on information and belief, pressure Mr. Kallman to pay Mrs. Kallman $9 million so that he could manage those funds at UBS, further his sexual relationship with Mrs. Kallman and fund his extravagant lifestyle. The plan to have Mr. Kallman arrested failed.

10.      UBS plainly failed to supervise Mr. Walker and the UBS Employees who assisted him in this scheme, causing substantial damages to Mr. Kallman and the Trust. The damage to Mr. Kallman has been severe. He was suicidal, is now routinely seeing a psychologist and psychiatrist, and is on multiple prescription drugs to treat the depression triggered by Mrs. Kallman's and Mr. Walker's outrageous conduct, which was made possible and assisted by UBS and the UBS Employees.

11.      Accordingly, Mr. Kallman commenced this action for several reasons. First, to protect the Trust that was initially funded by his parents. Thus, Mr. Kallman seeks to confirm that he has effectively removed Mrs. Kallman as Co-Trustee of the Trust pursuant to his exclusive power in the Trust to appoint a successor. (*See* Ex. 2, the "Trust".) If not effective, Mr. Kallman seeks to remove Mrs. Kallman as Co-Trustee pursuant to the New York Estates, Powers & Trusts Law ("EPTL") § 7-2.6(a)(2). He also seeks to void all unauthorized distributions made by Mrs. Kallman (and facilitated by Mr. Walker, UBS and the other UBS employees) pursuant to EPTL § 7-2.4. Mr. Kallman also seeks an accounting pursuant to EPTL § 7-2.7 because Mrs. Kallman has concealed information concerning the financial affairs of the Trust despite Mr. Kallman's request for such information.

12.      Mr. Kallman has also set forth causes of action against Mrs. Kallman and Mr. Walker for their tortious conduct directed at Mr. Kallman to extort $9 million, against UBS for its

failure to supervise Mr. Walker or its decision to negligently retain him, and the UBS Employees and against all Defendants for the unauthorized distributions from the Trust.

## **THE PARTIES**

13.     Plaintiffs Richard Kallman as Co-Trustee of the Kallman Family Irrevocable Trust and Richard Kallman Individually mean Mr. Kallman. He is Co-Trustee of the Trust, which provides in Article Eighth that "each Trust created hereunder shall be construed under and regulated by the laws of the State of New York and that the validity and effect of this Agreement shall be determined in accordance with the laws of that State and that the Trustee shall not be required to account in any Court other than one of the Courts of that State." (Ex. 2, Article Eighth.) In his capacity as Co-Trustee, Mr. Kallman is a client of Mr. Walker, UBS and the UBS Employees, and thus they owe a fiduciary duty to Mr. Kallman as a Co-Trustee of the Trust. He is also Mrs. Kallman's husband and they are in the midst of divorce proceedings pending in New Jersey. Mr. Kallman resides in New Jersey.

14.     Defendants Kineret Kallman as Co-Trustee of the Kallman Family Irrevocable Trust and Kineret Kallman Individually means Mrs. Kallman. She is or was a Co-Trustee of the Trust, is married to Mr. Kallman and is in the midst of divorce proceedings pending in New Jersey. Under Article Eighth of the Trust, she can only "be required to account" for her role as Co-Trustee of the Trust in the courts of New York State. (Ex. 2, Article Eighth.) She facilitated an unauthorized distribution of Trust funds to Taylor Kallman ("Taylor"), the daughter of Mr. and Mrs. Kallman. Taylor resides in New York County and, on information and belief, some or all of those improperly distributed Trust funds were used by Taylor, with Mrs. Kallman's advance knowledge and assistance, to make payments to New York University, which is located in New York County. Mrs. Kallman currently resides in Sea Girt, New Jersey, with her UBS financial advisor and

Defendant Ira Walker. She moved into Mr. Walker's Sea Girt home immediately upon her commencement of the divorce action.

15.    Defendant Ira Allen Walker ("Mr. Walker") is an individual and resides in Sea Girt, New Jersey. He is a wealth manager at UBS and persuaded Mrs. Kallman to move the Trust to UBS so he could manage the Trust's funds pursuant to the terms and conditions of the Trust, which provides that the Trust "shall be construed under and regulated by the laws of the State of New York and that the validity and effect of this Agreement shall be determined in accordance with the laws of that State." (Ex. 2, Article Eighth.) He facilitated an unauthorized distribution of Trust funds to Taylor and, on information and belief, knew that those funds would be transferred to Taylor in New York County and used by Taylor in New York County to pay New York University, which is also located in New York County.

16.    Defendant UBS Financial Services, Inc. ("UBS") is a Delaware corporation that is registered in New York as a foreign business corporation. It has multiple offices in New York County, including at 299 Park Avenue, New York, New York 10171. UBS is registered with the Securities and Exchange Commission (the "SEC" or "Commission") as a broker-dealer and investment adviser. It is an indirect subsidiary of UBS Group AG and UBS AG, global financial services firms registered and headquartered in Switzerland. UBS employs Mr. Walker and the other UBS Employees and was required to supervise the conduct of Mr. Walker and the UBS Employees. UBS also provided Mr. Walker and the UBS Employees with the facilities and tools to manage the Trust account, facilitate client services to the Trust and Mr. Kallman, both of whom were (and are) UBS clients, and owes a fiduciary duty to the Trust and Mr. Kallman due to his position as Co-Trustee of the Trust. Moreover, UBS agreed to abide by the terms and conditions of the Trust, which provides, among other things, that the Trust "shall be construed under and

regulated by the laws of the State of New York and that the validity and effect of this Agreement shall be determined in accordance with the laws of that State." (Ex. 2, Article Eighth.) On information and belief, UBS had constructive knowledge that Mr. Walker and the UBS Employees facilitated an unauthorized distribution of Trust funds to Taylor, who resides in New York County, so that Taylor could use those funds to make payments to New York University, which is also located in New York County.

17.     Defendants Unknown UBS Employees 1-10 (the "UBS Employees") refer to the unknown UBS Employees that assisted Mr. Walker and UBS with the conduct described in this Verified Complaint. As UBS Employees providing client services to the Trust and Mr. Kallman, they owed a fiduciary duty to each, and they also agreed to abide by the terms and conditions of the Trust, which provided, among other things, that the Trust "shall be construed under and regulated by the laws of the State of New York and that the validity and effect of this Agreement shall be determined in accordance with the laws of that State." (Ex. 2, Article Eighth.) The UBS Employees facilitated an unauthorized distribution of Trust funds to Taylor, who resides in New York County, so that Taylor could use those funds to make payments to New York University, which is also located in New York County.

## JURISDICTION AND VENUE

18.     Jurisdiction is proper in this Court pursuant to CPLR §§ 501, 503(a) and 503(b).

19.     Critically, the Trust was made in New York, New York, and the Trust explicitly provides that it "shall be construed under and regulated by the laws of the State of New York and that the validity and effect of this Agreement shall be determined in accordance with the laws of that State and that the Trustee shall not be required to account in any Court other than one of the Courts of that State." All Defendants agreed to abide by the terms and conditions of the Trust.

10

20.    In addition, a substantial part of the events or omissions giving rise to the claims alleged herein occurred in New York County. In particular, Defendants made the unauthorized distribution to Taylor, a beneficiary of the Trust who currently lives in New York County. In addition, and on information and belief, Taylor used those funds to make payments to New York University, which is also located in New York County.

21.    Venue is also proper in this Court pursuant to CPLR § 503(b) because Mr. and Mrs. Kallman were appointed as Co-Trustees of the Trust in New York County.

## STATEMENT OF FACTS

**A.    Mr. and Mrs. Kallman Establish A Trust Funded By Mr. Kallman's Parents That Requires Joint Authorization For Any Distributions**

     *i.*     ***The Trust Requires Mr. Kallman's "Consent In Writing" To Make A Distribution***

22.    Mr. and Mrs. Kallman were married on July 28, 1996, and have two children together, Taylor Kallman ("Taylor") and Jake Kallman ("Jake," and with Taylor, the "Children").

23.    On July 26, 2019, Mr. and Mrs. Kallman were designated as Co-Trustees of the Trust and executed the Trust as such.

24.    The Trust's two beneficiaries are Taylor and Jake.

25.    The Trust was funded with assets that belonged to Mr. Kallman's parents, Irwin and Sondra Kallman.

26.    The purpose of the Trust was to provide an efficient mechanism to transfer wealth to the Children, including wealth that Mr. Kallman or any other person may contribute to the Trust in the future, and also including wealth that had originated with Mr. Kallman's parents.

27.    Article Fifth § A(22) of the Trust provides that "if there shall be more than ONE (1) Trustee acting hereunder, any ONE (1) Trustee shall be authorized to exercise any other powers

11

granted hereunder or by applicable law, *provided that all other Trustee(s) then acting hereunder shall consent in writing*." (Ex. 2 (emphasis added).)

28.    EPTL § 10-10.7 also provides that when there are multiple fiduciaries, the powers afforded to those fiduciaries "may be exercised *jointly* by both such fiduciaries." (emphasis added).

29.    One such power provided by the Trust is to make distributions of net income and principal. (*See* Ex. 2, Article Second § B(2) and Article Fifth § A(14).)

> ii.    *The Prior Financial Advisor At JP Morgan Required All Distributions To Be Jointly Authorized By Mr. And Mrs. Kallman As Required By The Trust*

30.    The Trust's assets were previously held in an account managed by non-party JP Morgan.

31.    The financial advisor at JP Morgan responsible for administering the Trust was aware that the Trust plainly required both Mr. and Mrs. Kallman's consent to make any distributions—or do anything at all. (*See* Ex. 2.)

32.    Accordingly, the JP Morgan financial advisor consistently required that all actions related to the Trust be jointly authorized by both Mr. and Mrs. Kallman.

33.    On several occasions, the JP Morgan financial advisor had to enforce this joint requirement, reminding Mr. and Mrs. Kallman that they needed the other Co-Trustee's consent before JP Morgan could comply with directions from either of the Co-Trustees.

**B.    Mrs. Kallman And Mr. Walker Conceal Their Extra-Marital Affair And Desire To Fully Control The Trust In Derogation Of The Trust's Explicit Terms**

> i.    *Mrs. Kallman And Mr. Walker Conspire To Move The Trust To UBS*

34.    In early 2023, Mrs. Kallman told Mr. Kallman that she wanted to move all of her accounts and the Trust's account to UBS to be managed by Mr. Walker, UBS and the UBS Employees.

35.     On information and belief, Mrs. Kallman and Mr. Walker were, by this time, already having an extra-marital affair and Mrs. Kallman was in the midst of planning to divorce Mr. Kallman.

36.     Mrs. Kallman and Mr. Walker knew that to control the Trust, they had to get it away from JP Morgan, which consistently complied with the terms and conditions of the Trust by requiring Mr. Kallman's consent to take any action.

37.     The only way Mrs. Kallman and Mr. Walker could get control of the Trust account was to trick Mr. Kallman into authorizing the transfer to UBS.

38.     Mrs. Kallman and Mr. Walker knew Mr. Kallman would not authorize the transfer if they disclosed that they planned to control the Trust and no longer obtain Mr. Kallman's consent for actions concerning the Trust.

39.     Mrs. Kallman and Mr. Walker also knew that if they disclosed their extra-marital affair it would present an obvious conflict of interest that would make it completely inappropriate to transfer the Trust's assets to UBS under the management of Mr. Walker, UBS or the UBS Employees. Thus, they also knew that Mr. Kallman would not authorize the transfer if he knew of their extra-marital affair.

40.     Instead of disclosing this secret purpose and obvious conflict of interest, Mrs. Kallman and Mr. Walker, and potentially UBS and the other UBS Employees, concealed it from Mr. Kallman.

41.     Mrs. Kallman and Mr. Walker knew that the Trust's account had originally been funded with assets belonging to Mr. Kallman's parents. Thus, they could inflict emotional distress upon Mr. Kallman by wresting control of those assets away from Mr. Kallman and use that as a point of leverage in their effort to extort millions of dollars from Mr. Kallman in connection with

a divorce action that Mrs. Kallman and Mr. Walker were planning.

42.     Mrs. Kallman and Mr. Walker also knew that they could cause additional emotional distress upon Mr. Kallman by using the Trust, and its assets, to buy favor with the Children and alienate the Children from Mr. Kallman.

43.     As shown below, their plan has succeeded in part.

    *ii.*      ***Mrs. Kallman And Mr. Walker Dupe Mr. Kallman***
              ***To Transfer The Trust's Assets To UBS***

44.     As part of their plan, Mrs. Kallman and Mr. Walker pressed Mr. Kallman to authorize the transfer of the Trust account to UBS so that it could be managed by Mr. Walker, UBS and the UBS Employees.

45.     In mid-February 2023, Mrs. Kallman and Mr. Walker pulled the ripcord: they arranged to have all of her accounts, and the Trust account, transferred to UBS.

46.     After this unilateral transfer, Mrs. Kallman, who continued to deceive Mr. Kallman and hide her true purpose for transferring her and the Trust's assets to UBS (and Mr. Walker's true purpose), convinced Mr. Kallman to consent to the transfer.

47.     Thus, on or about February 22, 2023, Mr. Kallman signed a variety of UBS documents relating to the opening of the UBS Trust account.

48.     No disclosures were made to Mr. Kallman that Mrs. Kallman and Mr. Walker were in the midst of an extra-marital affair or that Mr. Walker, UBS and the UBS Employees planned to dishonor the Trust's unequivocal requirement that any distributions be made only with Mr. Kallman's written consent. No disclosures were made to Mr. Kallman that Mrs. Kallman and Mr. Walker were planning to wrest millions of dollars from Mr. Kallman in a divorce action.

49.     Had these disclosures been made, and the obvious conflicts of interest and breaches of fiduciary duty been presented to Mr. Kallman, he never would have authorized the transfer of

the Trust's account to UBS or to the management and care of Mr. Walker, UBS and the UBS Employees.

### iii.    The Defendants Owe A Fiduciary Duty To The Trust And Mr. Kallman

50.    Notwithstanding Mrs. Kallman's and Mr. Walker's effort to conceal their ulterior motives, and the Defendants' failure to disclose the conflicts of interest, all of the Defendants owe a fiduciary duty to the Trust.

51.    In addition, Mr. Walker, UBS and the UBS Employees also owe a fiduciary duty to Mr. Kallman as Co-Trustee of the Trust.

52.    UBS expressly acknowledged its fiduciary duties. Indeed, when the UBS account was opened, UBS provided Mr. Kallman "Disclosure information regarding new relationships with UBS," which included "two important disclosure documents for your review."

53.    The first "disclosure document[]," entitled a "Relationship summary for individual UBS Wealth Management Clients," provides, among other things, as follows:

> "All recommendations regarding your brokerage account will be made in a broker-dealer capacity, and all recommendations regarding your investment advisory account will be made in an advisory capacity. **Both capacities require that we act in your best interest**."

(Emphasis added.)

54.    That same "disclosure document" reiterated that "**When we provide you with a recommendation as your broker-dealer or act as your investment advisor,** we have to act in your best interest and not put our interest ahead of yours." (Emphasis in original.)

55.    UBS also falsely assured Mr. Kallman that conflicts of interest would be properly managed:

> "We address our conflicts of interest by maintaining policies and procedures requiring that Financial Advisors act in your interest, maintaining reasonable supervisory processes and disclosing these conflicts so that you

can make fully informed decisions."

56.    UBS's "reasonable supervisory processes" clearly failed.

57.    No disclosures were made to Mr. Kallman regarding an extra-marital affair between Mrs. Kallman, a UBS client, and Mr. Walker, her UBS financial advisor, and no disclosures were made concerning Mr. Walker's intent to insert himself into the divorce proceedings to demand, under threats of violence, that Mr. Kallman pay Mr. Walker's client, Mrs. Kallman, $9 million so that Mr. Walker could enrich himself, UBS, the UBS Employees and Mrs. Kallman.

58.    UBS acknowledged that it is required to "[d]isclose all material facts to you, including conflicts between our interests and your interests," obtain "informed consent after providing appropriate disclosure before engaging in transactions," and to, among other things, "act in what we reasonably believe to be your best interest." (*Id*.)

59.    UBS claims in its code of Conduct and Ethics that it has "internal control frameworks to support adherence with internal and external standards, and laws, rules and regulations." It further adds that "Anyone who breaches these will face consequences . . . . This may not only include the person who broke the rules but also their line manager and anyone who knew about it."

60.    Again, and as demonstrated further below, when it came to Mr. Walker and his relationship and conduct with his UBS client, Mrs. Kallman, and the conduct of Mr. Walker and the UBS Employees when dealing with Mr. Kallman as Co-Trustee, UBS failed to ensure that its own policies were followed.

61.    Instead of obtaining "informed consent after providing appropriate disclosure before engaging in transactions," Mr. Walker, UBS and the UBS Employees permitted the outrageous conduct detailed herein, including the facilitation of an unauthorized distribution from

the Trust.

**C.**     **Mrs. Kallman's And Mr. Walker's Relationship**

   *i.*     *Mr. Walker Uses Private Jets, Luxury Vacations And Lavish Gifts To Continue His Sexual Relationship With His Client Mrs. Kallman And Maintain Control Of Her Accounts And The Trust Account*

62.    Around the time that Mr. Walker and Mrs. Kallman moved her accounts and the Trust account to UBS, if not before, Mr. Walker made claims of wealth and luxury to Mrs. Kallman.

63.    Among other things, Mr. Walker told Mrs. Kallman that he is worth $55 million and owns a private jet.

64.    On information and belief, Mr. Walker made promises to Mrs. Kallman of wealth and a luxurious and high lifestyle to (a) influence her decision to move her accounts, and the Trust account, to UBS, and (b) influence her decision to have an extra-marital affair with Mr. Walker.

65.    Mr. Walker has taken Mrs. Kallman, his UBS client, and others on luxurious vacations using private jets, in potential violation of various regulatory gifts and entertainment prohibitions including FINRA Rule 3220.

66.    On information and belief, Mr. Walker's private jet travel appears to be facilitated by a New Jersey LLC that Mr. Walker created on or about July 13, 2019, called Flaps Down, LLC ("Flaps Down"). This entity, which is associated with his private jet travel, is not disclosed on his FINRA Form U-4 as an outside business activity.

67.    On information and belief, Mr. Walker also refers UBS clients to a private jet company called Flexjet and receives free private jet travel in violation of UBS, FINRA and SEC rules and regulations prohibiting monetary or other kickbacks. Plaintiffs are not yet aware of the financial use of Flaps Down, including whether Mr. Walker's various private jet travel with Mrs.

Kallman or others was documented as a UBS business trip or expensed as one.

68.     On information and belief, given that Mrs. Kallman is a client of UBS and not a family member of Mr. Walker, Plaintiffs allege that Mr. Walker's private jet travel with Mrs. Kallman was expensed as a UBS business trip and, more importantly, used as an enticement for Mrs. Kallman to move her and the Trust assets to UBS under Mr. Walker's management, thereby enriching Mr. Walker, UBS and the UBS Employees.

69.     On information and belief, the private jet travel was also used as an enticement for Mrs. Kallman to engage in her sexual relationship with Mr. Walker, her UBS financial advisor.

70.     On information and belief, in early May 2023, Mr. Walker funded a vacation Mrs. Kallman took to the Bahamas. Mr. Walker may have joined Mrs. Kallman in the Bahamas on this trip.

### ii.     Mrs. Kallman Files For Divorce And Continues Her Relationship With Mr. Walker

71.     On Saturday May 13, 2023, immediately after she returned from the Bahamas (possibly with Mr. Walker), Mrs. Kallman told Mr. Kallman that she wanted a divorce and demanded that he move out of their marital residence located in New Jersey.

72.     On information and belief, Mrs. Kallman immediately moved into Mr. Walker's multi-million-dollar home in New Jersey and has continued to reside there.

73.     In early August 2023, Mr. Walker, Mrs. Kallman and other family members travelled to the Bahamas via private jet. On information and belief, given that Mrs. Kallman is a client of UBS, Plaintiffs allege that Mr. Walker's private jet travel with Mrs. Kallman to the Bahamas was expensed as a UBS business trip, or was paid for using Mr. Walker's "soft dollars" (*i.e.*, free or discounted flights as gifts for introducing other UBS clients to a private jet company), either of which violates FINRA and SEC Rules, and internal UBS codes of conduct.

74. This trip was also used as an inducement for Mrs. Kallman to continue her intimate relationship with Mr. Walker, her UBS financial advisor, and to keep her funds and the Trust assets at UBS under Mr. Walker's management, thereby enriching Mr. Walker, UBS and the UBS Employees.

75. Mr. Walker also bought Mrs. Kallman's affection and financial loyalty as a UBS client by purchasing a $30,000-$40,000 Bulgari necklace for her, thus ensuring that he could continue to manage her accounts, the Trust account, and potentially other funds that she may acquire from Mr. Kallman in the divorce, including funds generated by Mr. Walker's demands and threats of violence, thus enriching himself, UBS and the UBS Employees.

76. As part of his ongoing effort to continue purchasing Mrs. Kallman's affection and financial loyalty as a UBS client, Mr. Walker took Mrs. Kallman, members of her family and certain friends, on a vacation to St. Barths in October 2023, and may have also taken Mrs. Kallman on another such vacation in or about April 2024.

77. On information and belief, given that Mrs. Kallman is a client of UBS and not a family member of Mr. Walker, Plaintiffs allege that Mr. Walker's private jet travel with Mrs. Kallman, and perhaps other expenses incident to this vacation, were expensed in whole or in part as a UBS business trip and used as an enticement for Mrs. Kallman to maintain her personal assets and the Trust assets at UBS under Mr. Walker's management, thereby enriching Mr. Walker, UBS and the UBS Employees.

**D.    Mrs. Kallman And Mr. Walker Inflict Emotional Distress On Mr. Kallman To Pressure Him To Pay $9 Million And Fund An Extravagant Lifestyle**

*i.    Mr. Walker Attends The First Mediation Session, Offers To Downgrade A TRO For $250,000 And The Marital Residence, And Pressures Mr. Kallman's Brother (And Employer)*

78.    On June 5, 2023, Mr. and Mrs. Kallman, through their respective attorneys, scheduled a meeting to discuss their separation and divorce.

79.    Although Mr. Walker is not a party to the divorce proceedings, he appeared without notice in lieu of Mrs. Kallman and purported to act on her behalf while simultaneously asserting that he was acting as a "neutral" to facilitate a resolution. He then promptly demanded that Mr. Kallman pay "$9 million, nonnegotiable" to Mrs. Kallman to settle the divorce.

80.    It was clear to Mr. Kallman that any settlement funds would be placed in the UBS accounts managed by Mr. Walker, thereby enriching Mr. Walker, UBS, the UBS Employees and further funding Mr. Walker's extravagant lifestyle and his relationship with Mrs. Kallman.

81.    Mr. Kallman quickly realized that he had been duped: Mrs. Kallman and Mr. Walker successfully deceived him into agreeing to move the Trust account to UBS so that they could control it, control the money his parents had provided (thus eliminating the oversight he previously had when the Trust was managed by JP Morgan), and control any funds Mrs. Kallman and Mr. Walker may obtain from Mr. Kallman in connection with the divorce.

82.    After Mr. Kallman and his divorce attorney Frank J. LaRocca ("Mr. LaRocca") refused to pay Mrs. Kallman $9 million, Mrs. Kallman and Mr. Walker commenced a pressure campaign to inflict emotional distress on Mr. Kallman so that he would ultimately accede to their financial demands.

83.    First, on June 7, 2023, two days after Mr. Kallman demanded $9 million, Mrs. Kallman filed for divorce with the Superior Court of New Jersey in the Chancery Division in

Monmouth County (the "Divorce Court"). *See Kallman v. Kallman*, Docket No. FM-13-1536-23 (Sup. Ct. N.J. Monmouth Cty.)

84.    Mrs. Kallman also made a Domestic Violence Civil Complaint and Temporary Restraining Order against Mr. Kallman dated May 22, 2023 in the Superior Court, Chancery Division, Family Party, of Monmouth County, New Jersey, listing Mr. Kallman's address as 60 East 8th Street, New York, New York 10003, and bearing docket no. FV-13-001865-23 (the "First TRO").

85.    Mr. Walker (not Mrs. Kallman) called Mrs. Kallman's divorce attorney, Edward Fradkin ("Mr. Fradkin"), after the first mediation session and stated in words and substance that he and his UBS client, Mrs. Kallman, would agree to downgrade the First TRO to a civil restraint if Mr. Kallman (a) pays them $250,000 and (b) signs over the marital house to Mrs. Kallman. Mr. Fradkin shared Mr. Walker's offer with Mr. LaRocca.

86.    Mr. Kallman did not agree to this demand. Nonetheless, the First TRO was dismissed on July 10, 2023, and Mr. and Mrs. Kallman instead consented to certain civil constraints.

87.    After the First TRO failed to induce Mr. Kallman to make payments to Mrs. Kallman (or turn over the entirety of their marital residence), Mrs. Kallman and Mr. Walker took additional steps to inflict emotional distress upon Mr. Kallman to force him to pay $9 million to Mrs. Kallman.

88.    Specifically, on August 16, 2023, Mr. Walker called Mr. Kallman's brother, Robert Kallman (who is also Mr. Kallman's boss), and pressured him to make payments to Mrs. Kallman.

89.    Robert Kallman interpreted Mr. Walker's call as a threat: if he and Mr. Kallman did not pay Mrs. Kallman an exorbitant sum, then Mrs. Kallman and Mr. Walker would continue

to harass Mr. Kallman until he or Robert Kallman did pay.

90.     Mr. Kallman continued to refuse to make the exorbitant payments that Mrs. Kallman and Mr. Walker demanded.

91.     As noted above, in August 2023, Mr. Walker, Mrs. Kallman and other family members travelled to the Bahamas via private jet. On September 7, 2023, after Mrs. Kallman returned from the Bahamas vacation with Mr. Walker, Mrs. Kallman filed a second Domestic Violence Civil Complaint and Temporary Restraining Order against Mr. Kallman in the Superior Court, Chancery Division, Family Part, of Monmouth County, New Jersey, this time listing Mr. Kallman's address as 1 Avalon Way, Apt. 1122, Old Bridge, New Jersey, and bearing docket no. FV-13-000473-24 (the "Second TRO").

92.     Mr. Walker, identified as the "Complainant," made a complaint to the Sea Girt police department, the town in which he lives. In response to the Second TRO, the police arrested Mr. Kallman and placed him in jail over the weekend.

93.     On January 4, 2024, Mr. Kallman pled guilty to a charge of harassment, was ordered to pay a financial penalty of $225, and serve 12 months of probation. *See State of New Jersey v. Richard Kallman*, Docket No. FO-13-110-24 (Superior Court of New Jersey, Chancery Division – Family Part, Monmouth County). Mr. Kallman paid the required fine and satisfactorily completed his term of probation early.

94.     Although the pressure Mrs. Kallman and Mr. Walker brought to bear on Mr. Kallman was clearly having an effect, Mr. Kallman still refused to pay Mrs. Kallman $9 million.

>    ***ii.***     ***Mr. Walker Threatens To "Beat" And Seriously Injure,***
>              ***If Not Murder, Mr. Kallman's Attorney,***
>              ***To Inflict Emotional Distress On Mr. Kallman And Extort $9 Million***

95.     On February 12, 2024, Mr. and Mrs. Kallman, though their attorneys, were

scheduled for another mediation session for the divorce.

96.     Mr. Walker again appeared and again purported to have authority to speak and act on Mrs. Kallman's behalf.

97.     This second mediation session concerned potential financial settlements, among other issues.

98.     At one point, Mr. and Mrs. Kallman's attorneys and the mediator assembled in a separate room. Approximately 45 to 50 minutes after they assembled, Mr. Kallman heard Mr. Walker screaming through an adjoining wall "f*ck them!, f*ck them!," plainly reflecting Mr. Walker's frustration that he had not yet succeeded in forcing Mr. Kallman to pay Mrs. Kallman millions of dollars, funds that he could use to enrich himself, UBS, the UBS Employees and finance his extravagant lifestyle.

99.     Mr. Walker then resorted to physical threats.

100.    Specifically, Mr. Walker stormed into the room where Mr. and Mrs. Kallman's attorneys and the mediator were assembled and said to Mr. Kallman's attorney, "hey, Frank, what's up!" Mr. LaRocca (*i.e.*, Frank) did not respond or react. Then Mr. Walker, in an even more hostile tone, repeated "hey, Frank, what's up!" After Mr. LaRocca again did not respond or react, Mr. Walker approached Mr. LaRocca and screamed that he is going to "take that ginny outside and beat his ass!" Mr. LaRocca is of Italian descent.

101.    In light of this threatening and outrageous conduct, Mr. LaRocca wrote to Mrs. Kallman's attorney, Edward Fradkin, immediately after the second mediation session ended, and made clear that "as Mr. Walker has threatened to 'take that ginny outside and beat his ass,' I can no longer provide [] consent" for Mr. Walker to attend any meetings. Mr. LaRocca further wrote, "Please advise your client that Mr. Walker shall not be present at any future in-person meetings in

this case" and that Mr. LaRocca wished "to have no communication with [Mr. Walker] at all, for any reason, unless he is under oath." (Ex. 3.)

102.    But Mr. Walker showed up to the next mediation session, which was held via zoom on April 5, 2024. Accordingly, the parties quickly and abruptly ended the mediation session given Mr. Walker's prior threatening and outrageous conduct.

103.    By early May 2024, Mrs. Kallman's and Mr. Walker's scheme to extort $9 million from Mr. Kallman had still not succeeded, so they increased the pressure even further by resorting to more explicit physical threats of violence and harm if Mr. Kallman did not accede to their financial demands.

104.    Specifically, in early May 2024, Mr. Walker threatened to seriously injure, if not murder, Mr. LaRocca. He conveyed this threat by calling Mr. Fradkin, Mrs. Kallman's divorce attorney, and specifically told Mr. Fradkin to communicate to Mr. LaRocca "that it could be dangerous to his health while he is walking from his office to his car."

105.    Mrs. Kallman's divorce attorney promptly filed a police report memorializing Mr. Walker's threat. (Ex. 1.) He also promptly filed a motion with the court overseeing the divorce (the "Divorce Court") requesting permission to resign as Mrs. Kallman's counsel.

106.    On May 15, 2024, Mr. Kallman's divorce attorneys filed a separate motion requesting that the Divorce Court bar Mr. Walker from further participation in the divorce proceedings given his threatening and outrageous conduct.

107.    On May 28, 2024, the Divorce Court ordered that Mrs. Kallman "shall not permit Ira Walker to attend any four-way conference, mediation, zoom call with counsel, mediator or Court, phone conference with counsel, mediator or Court appearance unless subpoenaed."

108.    The Divorce Court also "relieved" Mr. Fradkin "as counsel" for Mrs. Kallman.

109.    Incredibly, Mrs. Kallman's and Mr. Walker's outrageous conduct continued.

110.    Specifically, on or about June 14, 2024, on information and belief, either Mr. Walker or Mrs. Kallman filed a false police report alleging that Mr. Kallman sent harassing email and text messages to Mrs. Kallman from a spoofed telephone number.

111.    The police investigated and quickly recognized that these claims were false and thus refused to take further action on the allegations.

### iii.    The Defendants Knowingly Facilitate An Unauthorized Distribution Of The Trust's Funds And Mrs. Kallman Conceals Information About The Trust, Inflicting Emotional Distress On Mr. Kallman

112.    Mrs. Kallman's and Mr. Walker's conspiracy to cause emotional distress on Mr. Kallman and ultimately induce Mr. Kallman to pay Mrs. Kallman millions of dollars continued into the summer of 2024 when they saw an opportunity to violate the terms of the Trust and cause further alienation between Mr. Kallman and his daughter Taylor.

113.    In August 2024, Taylor requested that Mr. Kallman authorize a distribution from the Trust so that she could make a tuition payment to New York University, where she is currently a student. Taylor plainly recognized—because it was well known—that Mr. Kallman's authorization was required for any distribution from the Trust, which, as noted above, had been funded by Mr. Kallman's parents.

114.    At that time, Mr. Kallman refused to authorize this requested distribution because he determined that he needed to know the financial condition of the Trust and protect the Trust's assets not only for Taylor, but also for his son Jake, who has his own separate share trust for his benefit under the Trust.

115.    Mr. Kallman also wished to consider the potential tax implications of any such distribution because he thought (but did not know) that the Trust's assets may be held in publicly

traded securities. He was thus concerned that such a distribution could expose Taylor to a tax liability.

116.    Mr. Kallman did not know the financial condition of the Trust because, as noted above, the Trust's assets are currently held by UBS under Mr. Walker's control and thus information concerning the Trust has been concealed from him.

117.    After Mr. Kallman refused to authorize a distribution, Mrs. Kallman, with the assistance of Mr. Walker, UBS and the UBS Employees, and in violation of the Trust's explicit terms and conditions, made a distribution from the Trust to Taylor.

118.    The Defendants made this distribution from the Trust even though they knew that (a) under the terms of the Trust, Mr. Kallman's written consent was required to make this distribution and (b) Mr. Kallman had not provided written consent.

119.    On information and belief, Mrs. Kallman, Mr. Walker and the UBS Employees also knew that Mr. Kallman specifically refused to provide consent.

120.    Article Fifth § B of the Trust provides that "No Trustee shall be liable for any act or omission in administering any Trust herein created, *except that a Trustee shall be liable for actual fraud, gross negligence or willful misconduct*." (Ex. 2 (emphasis added).)

121.    Here, it is clear that Mrs. Kallman, with the assistance of Mr. Walker, UBS and the UBS Employees, engaged in willful misconduct by knowingly violating the terms of the Trust by making this unauthorized distribution.

122.    This willful misconduct also constituted a breach of Mrs. Kallman's fiduciary duty to the Trust.

123.    As set forth above, there is clearly friction between Mr. and Mrs. Kallman. This friction has plainly thwarted the proper administration of the Trust.

124.     Mr. Kallman fears that Mrs. Kallman, with the assistance of the other Defendants, may make further and additional unauthorized distributions from the Trust or otherwise violate the terms of the Trust. As a result, Mr. Kallman is no longer comfortable transferring funds to the Trust for the benefit of the Children, thwarting one of the principal reasons for the establishment of the Trust. He is also concerned that given Mrs. Kallman's breach of fiduciary duty and willful misconduct, Mrs. Kallman already has or will improperly administer the separate share trust under the Trust that is for Jake's benefit.

125.     It also bears emphasis that the funds to initially establish the Trust originated with Mr. Kallman's parents, Irwin and Sondra Kallman. Reflecting that, the Trust empowers only Mr. Kallman to appoint a successor Trustee: "In the event that any Trustee shall resign, fail to qualify or cease to act for any reason as Trustee, then RICHARD KALLMAN may appoint a successor Trustee or Co-Trustee as the case may be." (Ex. 2, Article Ninth § A.)

126.     Accordingly, and by a letter dated September 30, 2024, Mr. Kallman exercised his exclusive power to remove Mrs. Kallman as Co-Trustee and appoint a successor because Mrs. Kallman's breach of fiduciary duty and willful misconduct demonstrates that she failed to qualify as a Co-Trustee and ceased to act as a Co-Trustee of the Trust. (*See* Ex. 2, Article Ninth § A.)

127.     Mrs. Kallman and Mr. Walker knew that it would be particularly painful to Mr. Kallman to see the funds that his parents set aside for the Children used improperly and so, as part of their plan to cause as much emotional distress to Mr. Kallman as possible, they proceeded.

128.     Thus, Mr. Kallman seeks (a) a declaration that his removal of Mrs. Kallman as Co-Trustee of the Trust was effective or, alternatively, (b) an order removing Mrs. Kallman as Co-Trustee of the Trust pursuant to EPTL § 7-2.6(a)(2).

129.     Mr. Kallman also seeks a ruling that Defendants breached their fiduciary duty,

engaged in willful misconduct and are liable to the Trust for damages and must reimburse the Trust for all unauthorized distributions. Mr. Kallman also seeks an accounting.

**E.    UBS Failed To Properly Supervise Mr. Walker And The UBS Employees**

*i.    The SEC Requires UBS To Maintain Records Which Should Have Alerted UBS To The Conduct Described In This Complaint*

130.    The federal securities laws impose record-keeping requirements on broker-dealers such as UBS to ensure that they responsibly discharge their crucial role in the financial markets.

131.    Section 17(a)(1) of the Exchange Act authorizes the SEC to issue rules requiring broker-dealers to make and keep for prescribed periods, and furnish copies of, such records as necessary or appropriate in the public interest, for the protection of investors or otherwise in furtherance of the purposes of the Exchange Act.

132.    Rule 17a-4 of the Exchange Act (17 CFR sec. 240.17a-4) specifies the manner and length of time that the records created in accordance with other SEC rules, and certain other records produced by broker-dealers, must be maintained and produced promptly to SEC representatives.

133.    The rules adopted under Section 17(a)(1) of the Exchange Act, including Rule 17a-4(b)(4), require that broker-dealers preserve in an easily accessible place all communications received, and copies of all communications sent, relating to the firm's business.

134.    These rules impose minimum record-keeping requirements that are based on standards a prudent broker-dealer should follow in the normal course of business.

135.    These record-keeping requirements "are an integral part of the investor protection function of the Commission, and other securities regulators, in that the preserved records are the primary means of monitoring compliance with applicable securities laws, including antifraud provisions and financial responsibility standards." Commission Guidance to Broker-Dealers on the Use of Electronic Storage Media under the Electronic Signatures in Global and National

Commerce Act of 2000 with Respect to Rule 17a-4(f), 17 C.F.R. Part 241, Exchange Act Rel. No. 44238 (May 1, 2001).

ii.     **UBS Has Been Previously Investigated For Failing To Maintain Records That Would Allow It To Properly Supervise The Conduct Of Its Employees**

136.    Between January 2018 and September 2021, UBS was investigated over whether it properly monitored and preserved its employee communications as required by the SEC's rules and regulations.

137.    In particular, between January 2018 and September 2021, UBS received and responded to Commission subpoenas for documents and records in numerous SEC investigations.

138.    The SEC investigation uncovered that, from at least January 2018 to September 2021, UBS employees sent and received off-channel communications related to UBS business.

139.    The investigation showed that UBS did not maintain or preserve the substantial majority of these written communications, and that this failure was firm-wide, and involved employees at all levels of authority.

140.    As a result, the Commission concluded that UBS violated Section 17(a) of the Exchange Act and Rule 17a-4(b)(4) thereunder.

141.    The SEC investigation also uncovered that UBS's widespread failure to implement its own policies and procedures that prohibit such communications led to its failure to reasonably supervise its employees within the meaning of Section 15(b)(4)(E) of the Exchange Act.

142.    Thus, the Commission concluded that UBS failed to reasonably supervise its employees with a view to preventing or detecting certain of its employees' aiding and abetting violations of Section 17(a) of the Exchange Act and Rule 17a-4(b)(4) thereunder, within the meaning of Section 15(b)(4)(E) of the Exchange Act.

143.    The Commission notified UBS that it would commence an action against UBS for

violation of the securities laws, rules and regulations.

144.    Prior to the institution of that action, UBS enhanced its policies and procedures, and increased training concerning the use of communications devices, including on personal devices, and the preservation of records.

145.    In addition, UBS purportedly took significant measures to improve compliance with books and records keeping requirements, including UBS employees' use and preservation of all client and business-related communications and the monitoring of those communications.

146.    Ultimately, the Commission notified UBS that, notwithstanding the remedial measures it had already undertaken, the SEC would commence an action for violation of the federal securities laws. In lieu of a litigated, contested SEC enforcement action, UBS entered into an agreed-upon Consent Judgement and Consent Order with the SEC.

147.    That Consent Order is dated September 27, 2022, and is entitled: Under the Securities Exchange Act of 1934, Release No. 95929 / September 27, 2022 ADMINISTRATIVE PROCEEDING File No. 3-21174, In the Matter of UBS Financial Services, Inc. and UBS Securities LLC, Respondent, an: ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS, PURSUANT TO SECTIONS 15(b) AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER. The live link is https://www.sec.gov/files/litigation/admin/2022/34-95929.pdf

148.    That Consent Order requires UBS to comply with books and records keeping requirements, including UBS employees' use and preservation of all client and business-related communications, and the monitoring of those communications.

149.    Under the securities laws, rules and regulations discussed above, UBS and its

affiliates and subdivisions were required not only to maintain and preserve all communications with clients of UBS, and all business related communications, but to monitor those communications to ensure that UBS employees, including registered representatives, financial advisors, managing directors and senior portfolio managers, complied not only with the securities laws of the United States, but also the rules and regulations promulgated by the SEC and FINRA, and the ethics codes, policies and protocols adopted and enforced by UBS.

150.    Those UBS Policies and Codes of Conduct include the following provisions and obligations published by UBS:

- "For example, we don't just follow laws, rules and regulations – we do what is right based on our defined principles."

- "We act fairly, respectfully and honestly with everyone with whom we deal."

- "For example, we don't distort or try to hide the facts or the truth. Nor do we use information outside of intended business purposes."

- "For example, we not only make our products, services and interactions with or for clients relevant to them, but also ensure they are not conflicting with laws, rules and regulations and that potential conflicts with clients' interests are properly addressed."

- "We are committed to holding ourselves accountable to identify, prevent, escalate, and manage potential, actual or perceived conflicts of interest – by raising and addressing them immediately. For example, we disclose, through the appropriate mechanisms, any activities, relationships or interests which may give rise to any potential, actual or perceived conflict of interest that could harm our clients, undermine the integrity and efficiency of the financial markets, cause UBS to breach legal and / or regulatory obligations, and / or harm UBS's reputation."

- "We remain focused, engaged, and diligent to prevent misconduct."

- "We don't do anything that may put anyone in danger or at the risk of harm."

- "We are committed to obeying the laws, rules and regulations of the areas where we live, work and do business, and heeding our own governance framework, documents and policies."

- "....we don't tolerate any form of corruption or bribery, including facilitating payments – nor do we offer or accept improper gifts or payments."

- "We are committed to safeguarding the information clients have shared with us, protecting all forms of data, information and assets and only using them in an ethical way and within jurisdictional laws, rules and regulations."

- "We also don't use data and information in ways that could harm our clients, employees, the public or the markets."

- "We are committed to incentivizing the right behavior by establishing reward principles and internal control frameworks to support adherence with internal and external standards, and laws, rules and regulations. Anyone who breaches these will face consequences – up to, and including, dismissal. This may not only include the person who broke the rules but also their line manager and anyone who knew about it but did not escalate the matter."

- "For example, we don't condone or protect actions amounting to criminal behavior – and will not hesitate to bring it to the attention of the relevant authorities."

151.    Instead of complying with these principles, UBS violated them.

***iii.    Despite The Consent Order, UBS Ignored Mr. Walker's Conduct Or Failed To Properly Monitor Or Detect His Conduct Or The Conduct Of The UBS Employees***

152.    At all times relevant to this action, from at least January 2023 to today, Mr. Walker was a registered representative, financial advisor, managing director and senior portfolio manager at UBS.

153.    At all times relevant to this action, from at least January 2023 to today, the UBS Employees worked for or with Mr. Walker and were employees of UBS.

154.    As such, UBS had compliance and policy obligations to preserve and monitor Mr. Walker's emails, text messages and communications with and concerning his UBS client, Mrs. Kallman, to ensure that he was not violating the securities laws of the United States; the rules and regulations promulgated by the SEC and FINRA; and the ethics codes, policies and protocols

adopted and enforced by UBS.

155.    UBS failed to properly supervise, monitor, detect and prevent, Mr. Walker's conduct set forth herein which, among other laws and regulations, violated FINRA Rule 3110 (Supervision), FINRA Rule 2010 (Standards of Commercial Honor and Practice), FINRA Rule 3220 (the Gifts Rule), and SEC Rule 10(b)(5) (use of manipulative practices).

156.    UBS negligently retained or negligently supervised Mr. Walker and the UBS Employees because had UBS properly monitored their emails, text messages and communications with and concerning Mrs. Kallman and the Trust (both UBS clients), as UBS was required to do and committed to do under its policies and procedures and pursuant to the Consent Order, UBS would have discovered Mr. Walker's improper and conflicted relationship, breaches of his fiduciary duties (and breaches of fiduciary duties by the UBS Employees), and violations of numerous securities rules and regulations, and would have discovered many if not all of the actions and conduct described herein.

157.    Alternatively, UBS negligently retained or negligently supervised Mr. Walker and the UBS Employees because UBS discovered Mr. Walker's improper and conflicted relationship, breaches of his fiduciary duties (and breaches of fiduciary duties owed by the UBS Employees), and violations of numerous securities rules and regulations, and failed to prevent this conduct and failed to terminate their employment with UBS.

**F.    Mr. Kallman Has Suffered Severe Psychological Trauma
Due To Mrs. Kallman's And Mr. Walker's Outrageous Conduct And
<u>Was Terminated From His Position At His Family Business</u>**

158.    Mrs. Kallman's and Mr. Walker's conspiracy to inflict emotional distress upon Mr. Kallman all so that they can extort $9 million from him has succeeded in part.

159.    Although Mr. Kallman has refused to make this $9 million payment, he now sees a

psychologist every week and a psychiatrist every other week.

160.    Mr. Kallman was suicidal and is now on prescription medication to treat depression, bipolar disorder, manic depression, sleep disorder and anxiety.

161.    Mr. Kallman's brother, Robert Kallman, who is also his employer, fired him from his job, because Mr. Kallman was unable to function at work due to the intentional emotional distress caused by Mrs. Kallman and Mr. Walker.

162.    Mr. Kallman has since rejoined the business that his brother leads.

163.    The substantial damages Mr. Kallman incurred due to the Defendants' outrageous conduct will likely last for the rest of his life.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment Against Mrs. Kallman)

164.    Plaintiffs repeat, reallege and incorporate by reference the allegations set forth above with the same force and effect as if fully set forth herein.

165.    Mr. Kallman exercised his exclusive power under the Trust to remove Petitioner as Co-Trustee of the Trust. (*See* Ex. 2.)

166.    There is a justiciable controversy between the parties regarding whether Mr. Kallman's removal of Mrs. Kallman as Co-Trustee was effective.

167.    A ruling from this Court would serve a useful purpose in clarifying and settling whether Mr. Kallman's removal of Mrs. Kallman as Co-Trustee of the Trust was effective.

## SECOND CAUSE OF ACTION
### (Removal of Mrs. Kallman as Co-Trustee of the Trust)

168.    Plaintiffs repeat, reallege and incorporate by reference the allegations set forth above with the same force and effect as if fully set forth herein.

169.    EPTL § 7-2.6(a)(2) provides, in part, that the Supreme Court has the power "[o]n

the application of any person interested in the trust estate, to suspend or remove a trustee who has violated or threatens to violate his trust."

170.    Here, Mrs. Kallman violated the terms of the Trust by making an unauthorized distribution without Mr. Kallman's written consent.

171.    Accordingly, to the extent that Mrs. Kallman was not removed from her position as Co-Trustee of the Trust by virtue of Mr. Kallman's exercise of his exclusive power under the Trust to appoint a successor, Mrs. Kallman should be removed as Co-Trustee pursuant to EPTL § 7-2.6(a)(2).

**THIRD CAUSE OF ACTION**
**(Breach of Fiduciary Duty against all Defendants)**

172.    Plaintiffs repeat, reallege and incorporate by reference the allegations set forth above with the same force and effect as if fully set forth herein.

173.    Defendants have a fiduciary duty to the Trust and to Mr. Kallman.

174.    Mr. Walker, UBS and the UBS Employees owe the Trust (and Mr. Kallman as Co-Trustee) fiduciary duties, including the duty of care and loyalty.

175.    Defendants engaged in willful misconduct by, among other things, violating the terms of the Trust.

176.    This misconduct included making and facilitating an unauthorized distribution of Trust assets from the Trust account at UBS.

177.    This misconduct also included enabling and facilitating the threats and improper and outrageous actions by Mr. Walker, as detailed above.

178.    Mrs. Kallman's breach was the product of her personal animus directed towards Mr. Kallman, reflecting a personal conflict of interest.

179.    Defendants' willful misconduct was contrary to the interests of Mr. Kallman, to

whom they owed a duty.

180. Mr. Kallman was damaged by the Defendants' willful misconduct.

181. Defendants' willful misconduct was also contrary to the interests of the Trust.

182. The Trust was damaged by the Defendants' willful misconduct.

## FOURTH CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duty against Mr. Walker, UBS and the UBS Employees)

183. Plaintiffs repeat, reallege and incorporate by reference the allegations set forth above with the same force and effect as if fully set forth herein.

184. Mr. Walker, UBS and the UBS Employees assisted Mrs. Kallman in her violation of the terms and conditions of the Trust and thus assisted her in violating her fiduciary duties to the Trust.

185. Mr. Walker, UBS and the UBS Employees had possession of the Trust agreement and were aware of the provisions contained therein requiring Mr. Kallman's written consent and knew that Mrs. Kallman owed fiduciary duties to the Trust.

186. Mr. Walker, UBS and the UBS Employees facilitated Mrs. Kallman's unauthorized distribution of Trust assets, despite knowing she was doing so in contravention of the terms of the Trust and violating her fiduciary duties to the Trust.

187. Thus, Mr. Walker, UBS and the UBS Employees aided and abetted Mrs. Kallman's breach of her fiduciary duty.

188. Moreover, Mr. Walker, UBS and the UBS Employees aided and abetted the improper, conflicted and outrageous conduct of Mr. Walker and Mrs. Kallman in contravention of the fiduciary duties owed to Mr. Kallman and the Trust.

## FIFTH CAUSE OF ACTION
### (Willful Misconduct against all Defendants)

189.    Plaintiffs repeat, reallege and incorporate by reference the allegations set forth above with the same force and effect as if fully set forth herein.

190.    Defendants breached the terms and conditions of the Trust because they engaged in an act of willful misconduct by knowingly making an unauthorized transfer of funds from the Trust without Mr. Kallman's written consent.

191.    Defendants engaged in willful misconduct by committing the outrageous and improper conduct against Mr. Kallman that is described herein.

192.    The Trust was damaged as a result of Defendants' willful misconduct.

193.    Defendants are liable for their willful misconduct.

## SIXTH CAUSE OF ACTION
### (Void Unauthorized Distributions against all Defendants)

194.    Plaintiffs repeat, reallege and incorporate by reference the allegations set forth above with the same force and effect as if fully set forth herein.

195.    EPTL § 7-2.4 provides, in full, that "If the trust is expressed in the instrument creating the estate of the trustee, every sale, conveyance or other act of the trustee in contravention of the trust, except as authorized by this article and by any other provision of law, is void."

196.    Here, Defendants made one or more distributions from the Trust in contravention of the Trust because such distributions were not made with Mr. Kallman's written consent.

197.    Accordingly, all such distributions are void and must be reimbursed by Defendants.

## SEVENTH CAUSE OF ACTION
### (Accounting)

198.    Plaintiffs repeat, reallege and incorporate by reference the allegations set forth above with the same force and effect as if fully set forth herein.

199.    EPTL § 7-2.7 provides for "an accounting" where brought by a trustee.

200.    Mr. Kallman is the Co-Trustee of the Trust and thus responsible for the proper administration of the Trust. However, Mr. Kallman has no access to information concerning the Trust.

201.    Mr. Kallman has requested information concerning the Trust from Mrs. Kallman but she has not provided any information.

202.    Mr. Kallman has no adequate legal remedy.

203.    Accordingly, Mr. Kallman seeks an accounting.

## EIGHTH CAUSE OF ACTION
### (Breach of Contract against all Defendants)

204.    Plaintiffs repeat, reallege and incorporate by reference the allegations set forth above with the same force and effect as if fully set forth herein.

205.    The Trust is a valid and enforceable agreement.

206.    The Defendants agreed to abide by the terms of the Trust.

207.    The Defendants violated their obligations under the Trust by making an unauthorized distribution from the Trust's UBS account.

## NINTH CAUSE OF ACTION
### (Malicious Interference with Contract Rights against
### Mr. Walker, UBS and the UBS Employees)

208.    Plaintiffs repeat, reallege and incorporate by reference the allegations set forth above with the same force and effect as if fully set forth herein.

209.    Mr. Walker, UBS and the UBS Employees have knowledge of the terms and conditions of the Trust, including the provision making unmistakably clear that Mr. Kallman's "consent in writing" is required to make any distributions from the Trust.

210.    Mr. Walker, UBS and the UBS Employees knowingly induced Mrs. Kallman to

facilitate an unauthorized distribution from the Trust's UBS account, breaching her obligations under the Trust.

211.    There was no reasonable justification or excuse for Mr. Walker, UBS and the UBS Employees to induce this breach of the Trust.

212.    Rather, Mr. Walker spearheaded this breach as part of his coordinated pressure-campaign with Mrs. Kallman to exert pressure on Mr. Kallman and inflict emotional distress.

213.    This conduct has caused damages to Mr. Kallman in his capacity as Co-Trustee of the Trust.

214.    Mr. Walker, UBS and the UBS Employees are thus liable to Mr. Kallman as Co-Trustee of the Trust for the damages they have caused.

## TENTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress against Mrs. Kallman and Mr. Walker)

215.    Plaintiffs repeat, reallege and incorporate by reference the allegations set forth above with the same force and effect as if fully set forth herein.

216.    Mrs. Kallman and Mr. Walker engaged in an intentional or reckless scheme in an effort to extort $9 million from Plaintiff.

217.    Mrs. Kallman and Mr. Walker's conduct was extreme and outrageous.

218.    Mrs. Kallman and Mr. Walker intended to cause severe emotional distress to Mr. Kallman by their actions.

219.    As a result of Mrs. Kallman's and Mr. Walker's conduct, Mr. Kallman has suffered severe emotional distress to the point that he temporarily lost his job, has been suicidal and is now on medication to treat depression.

220.    Thus, Mrs. Kallman and Mr. Walker are liable for intentionally inflicting emotional distress upon Mr. Kallman.

## ELEVENTH CAUSE OF ACTION
### (Respondeat Superior against UBS)

221.    Plaintiffs repeat, reallege and incorporate by reference the allegations set forth above with the same force and effect as if fully set forth herein.

222.    Mr. Walker and the UBS Employees violated the terms of the Trust by facilitating an unauthorized distribution of Trust funds from the UBS account.

223.    Mr. Walker also engaged in a concerted effort with Mrs. Kallman to extort $9 million from Mr. Kallman and inflict severe emotional distress upon Mr. Kallman.

224.    Mr. Walker and the UBS Employees engaged in this conduct in order to increase the assets they could manage at UBS, enriching themselves and UBS.

225.    Managing client accounts is part of the duties that Mr. Walker and the UBS Employees owe to UBS.

226.    UBS was required to exercise control over Mr. Walker and the UBS Employees as it relates to the conduct alleged herein.

227.    Accordingly, UBS is liable under the theory of *Respondeat Superior*.

## TWELFTH CAUSE OF ACTION
### (Negligent Retention against UBS)

228.    Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth above with the same force and effect as if fully set forth herein.

229.    UBS employs Mr. Walker and the UBS Employees.

230.    UBS was required to monitor and supervise Mr. Walker and the UBS Employees, including with respect to the conduct alleged herein.

231.    UBS knew or should have known that it had the ability to control Mr. Walker and the UBS Employees and knew of the necessity to exercise such control and had the opportunity to

do so.

232.    On information and belief, UBS had constructive knowledge that Mr. Walker and the UBS Employees facilitated and aided and abetted the improper, conflicted and outrageous conduct set forth herein against Mr. Kallman, the Co-Trustee of the Trust (and thus a client), and engaged in the grossly inappropriate and conflicted relationship with Mrs. Kallman, also a UBS client.

233.    But for UBS' failure to monitor and supervise Mr. Walker and the UBS Employees, the conduct alleged herein would not have occurred.

234.    On information and belief, UBS had constructive knowledge that Mr. Walker and the UBS Employees facilitated an unauthorized distribution from the Trust's UBS account in direct violation of the terms of the Trust.

235.    But for UBS' failure to monitor and supervise Mr. Walker and the UBS Employees, the distribution of trust assets without Plaintiff's consent would not have occurred and the conduct alleged herein would not have occurred.

### THIRTEENTH CAUSE OF ACTION
#### (Negligent Supervision against UBS)

236.    Plaintiffs repeat, reallege and incorporate by reference the allegations set forth above with the same force and effect as if fully set forth herein.

237.    UBS employs Mr. Walker and the UBS Employees.

238.    UBS was required to monitor and supervise Mr. Walker and the UBS Employees, including with respect to the conduct alleged herein.

239.    UBS knew or should have known that it had the ability to control Mr. Walker and the UBS Employees and knew of the necessity to exercise such control and had the opportunity to do so.

240.    On information and belief, UBS had constructive knowledge that Mr. Walker and the UBS Employees facilitated an unauthorized distribution from the Trust's UBS account in direct violation of the terms of the Trust.

241.    UBS had constructive knowledge that Mr. Walker and the UBS Employees engaged in tortious conduct directed at the Plaintiffs using UBS' property and while on the premises of UBS.

242.    But for UBS' failure to monitor and supervise Mr. Walker and the UBS Employees, the distribution of Trust assets without Mr. Kallman's consent would not have occurred, and the outrageous, conflicted and improper conduct alleged herein would not have occurred.

## PRAYER FOR RELIEF

**WHEREFORE**, Mr. Kallman respectfully demands judgment in his favor as follows:

A.    On his First Cause of Action, a declaration that Mrs. Kallman is no longer a Co-Trustee of the Trust;

B.    On his Second Cause of Action, a ruling removing Mrs. Kallman as Co-Trustee of the Trust;

C.    On his Third Cause of Action, a ruling that Defendants breached their fiduciary duty and caused damages in an amount to be determined at trial of no less than $10 million;

D.    On his Fourth Cause of Action, a ruling that Mr. Walker, UBS and the UBS Employees aided and abetted Mrs. Kallman's breach of fiduciary duties to the Trust and to Mr. Kallman, and that they are jointly and severally liable to the Trust and Mr. Kallman in an amount to be determined at trial of no less than $10 million;

E.    On his Fifth Cause of Action, a ruling that Defendants engaged in willful misconduct in respect of the Trust and Mr. Kallman, and are thus jointly and severally

liable to the Trust and Mr. Kallman in an amount to be determined at trial of no less than $10 million;

F.     On his Sixth Cause of Action, a ruling that any distributions made from the Trust without Mr. Kallman's written consent are void and must be reimbursed by Defendants;

G.     On his Seventh Cause of Action, an accounting;

H.     On his Eighth Cause of Action, a ruling that Defendants breached their contractual obligations to the Trust and caused damages in an amount to be determined at trial;

I.     On his Ninth Cause of Action, a ruling that Mr. Walker, UBS and the UBS Employees maliciously interfered with the contractual rights set forth in the Trust and are thus jointly and severally liable for damages to the Trust in an amount to be determined at trial;

J.     On his Tenth Cause of Action, a ruling that Mrs. Kallman and Mr. Walker intentionally inflicted emotional distress on Mr. Kallman and are thus jointly and severally liable to Mr. Kallman in an amount to be determined at trial of no less than $10 million;

K.     On his Eleventh Cause of Action, a ruling that UBS is liable to Mr. Kallman under the theory of *respondeat superior* in an amount to be determined at trial of no less than $10 million;

L.     On his Twelfth Cause of Action, a ruling that UBS is liable to Mr. Kallman for negligent retention in an amount to be determined at trial of no less than $10 million;

M.     On his Thirteenth Cause of Action, a ruling that UBS is liable to Mr. Kallman for negligent supervision in an amount to be determined at trial of no less than $10 million;

N.     Punitive damages;

O.     An award of costs and disbursements incurred in connection with this action, plus

pre- and post-judgment interest and attorneys' fees; and

P.        Such other and further relief as the Court deems just and proper.

DATED:    November 5, 2024
           New York, New York

**THE LAW OFFICES OF ALAN S. FUTERFAS**

By: _____

Alan S. Futerfas (asfuterfas@futerfaslaw.com)
565 Fifth Avenue, 7th Floor
New York, New York 10017
Tel.: (212) 684-8400

Michael P. Richter (mrichter@ghsklaw.com)
**GRANT HERRMANN
SCHWARTZ & KLINGER LLP**
107 Greenwich Street, 25th Floor
New York, New York 10006
Tel.: (212) 682-1800

Bettina Schein (bschein@bettinascheinlaw.com)
**LAW OFFICES OF BETTINA SCHEIN**
565 Fifth Avenue
New York, New York 10017
Tel.: (212) 880-9417

*Attorneys for Plaintiffs Richard Kallman as
Co-Trustee of the Kallman Family Irrevocable Trust
and Richard Kallman Individually*

45

## VERIFICATION

STATE OF New Jersey )
                           ) ss:
COUNTY OF Monmouth )

       Plaintiff Richard Kallman, being duly sworn, deposes and says that he has read the

foregoing First Amended Verified Complaint and knows the contents thereof; and that the same

is true to his own knowledge, except as to those matters herein stated to be alleged on

information and belief, and as to those matters, he believes them to be true.

Richard Kallman
*Co-Trustee of The Kallman Family
Irrevocable Trust*

Sworn to before me
this 5th day of November, 2024

NOTARY PUBLIC

KAITLYN M ROVINSKY
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES AUGUST 29, 2029
COMMISSION: #50224997

46